JOHN JONES, APPELLEE, V. HENRY SCHMIDT, APPELLANT.

80 N. W. 2d 289

Filed January 4, 1957. No. 34052.

*Leamer & Graham* and *Max W. Goetz,* for appellant.

*Clarence E. Haley* and *Philip H. Robinson,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action of forcible entry and detainer brought by John Jones against Henry Schmidt in the county court of Cedar County to recover possession of certain land. Trial was had and the county judge entered judgment for the plaintiff. The defendant appealed to the district court. Trial was had to a jury and the jury found the defendant guilty. Judgment was entered on the verdict. The defendant filed a motion for new trial which was overruled. The defendant perfected appeal to this court.

For convenience we will refer to the parties as they were designated in the district court.

The plaintiff filed a petition in the district court for Cedar County alleging that he was the owner and entitled to the immediate possession of certain land which is described in the petition; that on March 1, 1947, the defendant became the lessee of the plaintiff as successor lessee to John V. Schmidt under verbal leases from year to year for such property; that prior to September 1, 1953, the plaintiff notified the defendant that his tenancy would terminate on March 1, 1954, and that he should vacate and surrender possession of the said land to the plaintiff on that date; and that on September 19, 1955, the plaintiff had a written notice served on the defendant to vacate said premises within 3 days after the date of service thereof which period had elapsed, and the defendant unlawfully and forcibly detained possession of said premises from the plaintiff. The petition prayed for restitution of said premises and costs.

The defendant's answer specifically denied that the plaintiff was the owner of the property described in the plaintiff's petition or any part of the same, and that the defendant negotiated a lease with the plaintiff. The defendant's answer then set up certain facts to prove

ownership of the land by adverse possession.

The plaintiff's reply alleged that the defendant, by his answer, sought to alter and change the only issue in the case, namely that of the right of possession of said property, and that the defendant was attempting to resolve this action into one in equity. The plaintiff moved to strike that portion of the answer that set up facts attempting to prove ownership of the land in question by the defendant by adverse possession. This motion was sustained by the trial court.

While the defendant sets forth several assignments of error, the one pertinent to a determination of this appeal is that the verdict is contrary to law.

In cases of forcible entry and detainer such as the instant case there are well-established rules of law which are applicable, as follows.

County courts have jurisdiction of actions for the forcible entry and detainer of real property. See Blaco v. Haller, 9 Neb. 149, 1 N. W. 978.

District courts have no original jurisdiction of cases in forcible detainer. The jurisdiction of said courts in such actions is acquired only by appeal or proceedings in error. See, Armstrong v. Mayer, 60 Neb. 423, 83 N. W. 401; Northwestern State Bank v. Hanks, 118 Neb. 442, 225 N. W. 119.

In an action of forcible detainer, the contest is limited to the naked right of possession. Van Sant v. Beuder, 101 Neb. 680, 164 N. W. 711.

The action is merely possessory, and the question of title to real estate cannot be either tried or determined in such case. Towles v. Hamilton, 94 Neb. 588, 143 N. W. 935.

In an action of forcible entry and detainer the mere filing by the defendant of an answer claiming title to the premises will not deprive a justice of the peace or county judge of jurisdiction. If, however, on the trial it should appear that the action is not in fact for the recovery of the possession of the premises, but to

determine the question of title, the court will have no authority to proceed, and the case must be dismissed. See, Pettit v. Black, 13 Neb. 142, 12 N. W. 841; Lipp v. Hunt, 25 Neb. 91, 41 N. W. 143; Gregory v. Pribbeno, 143 Neb. 379, 9 N. W. 2d 485.

As stated in Northwestern State Bank v. Hanks, *supra*: "Where the title to land, which is sought to be recovered in a forcible detention case, is drawn in question and evidence thereon is submitted in the county court, the district court, on appeal therefrom, is without jurisdiction to hear and to determine the controversy and, in such case, the action stands for dismissal."

This case involves land on what is known as St. Helena Island in the Missouri River within the boundary of Cedar County. The evidence contains aerial photographs of the island and the land in question, the original survey of the island made in 1858, and a survey of the same made in October 1955, and filed of record. Various witnesses identified certain objects on the aerial photographs including the land in controversy, section lines, fences, the Missouri River, and what is referred to by rivermen as the "chute." The action of the Missouri River has cut sharply into the land at one point which is referred to in the evidence as the "neck." The land to the northwest of the neck has been referred to or known as the upper end of the island, and that to the southwest as the lower end. This neck joins the land occupied by the defendant and the lower end of St. Helena Island.

The record discloses that the plaintiff John Jones, also referred to in the evidence as Jack Jones, is 61 years of age, was born on St. Helena Island, and spent most of his life on the island. In the late 1890's his father moved a mill off the island to the town of St. Helena. In 1926 and 1927, the plaintiff's mother was in possession of the island and rented part of it for pasture. What is referred to as the "upper" part of the island, the land in controversy in this case, in 1926 was

nothing but pasture land. It was difficult to grub this land out for farming because the work had to be done by hand. The plaintiff lived on what is known as the "lower" end of the island. He testified that this land is continuous between the lower and upper ends of the island. From 1926, they were always able to drive from the house on the lower end of the island to the upper end of the island onto the land in controversy. In 1931 and 1932, plaintiff's brother Joe Jones looked after the land for the plaintiff's mother and rented pasture land. The plaintiff and his wife moved onto the island in 1933, and took over renting the land in 1934. The plaintiff claimed he made a verbal lease of the land in controversy with John Schmidt in 1934. The plaintiff testified that the agreement was that John Schmidt was to go onto the land, break some of it up, farm it, look after it for the plaintiff, and in return he could keep the crop; and that John Schmidt entered the land under that agreement. The following years the plaintiff checked with him, made several visits to the property, and observed that he had done some clearing of brush and trees. In 1936, the plaintiff pastured 180 head of cattle belonging to himself and other persons on this land, and at that time he observed John Schmidt farming the land. The same year the plaintiff put some fence on the land to keep the cattle out of John Schmidt's corn. The plaintiff further testified that in 1947, John Schmidt told the plaintiff that he had purchased some land from the box factory and wanted to discontinue his lease. In August 1947, the plaintiff stopped at the defendant's place and had a conversation with him about renting this land. He made a deal with Henry Schmidt on the same terms as the deal with his brother John Schmidt. Henry Schmidt took possession of the land. During 1947 and subsequent years, the plaintiff made visits to the upper end of the island. He further testified that there was a chute on the south side of the island which at one time was one of the main channels

of the Missouri River. In the fall of 1948, the plaintiff was doing some custom threshing and crossed the chute at the same place that Henry Schmidt crossed it. After a flood in 1952, the chute was filled up with debris and not useful as a navigable stream. In 1953, the plaintiff had a conversation with one of Henry Schmidt's sons to the effect that Henry Schmidt, the defendant, was going to claim this land as his own. As a result of the conversation the plaintiff and his wife went to the defendant's home. The defendant, his wife, and other members of his family were there. The plaintiff told the defendant the purpose of the visit. He had a lease that he wanted the defendant to sign. The defendant refused to sign the lease. The plaintiff told him that he was going to farm the land himself, and wanted possession March 1, 1954. The defendant did not yield possession, so on September 19, 1955, a notice to quit was served on the defendant.

On cross-examination the plaintiff testified that the first time he saw the defendant working on this land was in 1947; that he had been on the land several times prior to 1947; that the only cattle he saw on the land were his own; and that he never saw the defendant clear any of this land until after 1947. Only during the last year or so did he see some alfalfa growing on the land, and in the last 2 or 3 years he saw some pigs that belonged to the defendant on the land. There was a 12 by 16 foot house covered with asphalt shingles moved onto the land by John Schmidt, and a shed built of willows and straw. The fields in 1944 were open, with no fences around them. The first fence was built in 1947 or 1948. The defendant put in a few fences, and as far as the plaintiff knew, they belong to the defendant, except a short piece of fence across the west side of the neck which belongs to the plaintiff.

A nephew of the plaintiff testified that during 1933 and through 1941, he farmed some land on St. Helena Island proper, and John Schmidt farmed land west of

the neck. Up until 1941, he never heard about, nor did he see, the defendant farm the land in controversy.

The wife of the plaintiff corroborated his testimony with reference to the plaintiff presenting the lease to the defendant at the defendant's home and the defendant's refusal to sign it.

The defendant testified that he was 64 years old, and lived northwest of St. Helena where he had lived all of his life. The first time he occupied the land in controversy was in 1927. Speaking of the chute, he testified that it comes in from the north and heads toward the south, running generally southeast. The neck of the chute is the southeast corner of the land he claimed. There is a fence that he put in in the late 1930's, and there is a fence along the chute on the north side that he has maintained at all times. He started to clear the land in 1934, with the help of his wife, and built fences around the fields to keep the cattle confined. In 1927, he kept 10 or 15 head of cattle on this land. He also had horses on this land. In 1927, the island was nothing but sand. There were a lot of willows, and some grass and sweet clover on the land. He has fenced in each field that he cleared, and has somewhere near 8 miles of fence on this land. In 1937, he moved a plow shed on this land and used it for a cook shack and shelter. In 1947, he built a cow shed of poles and straw. He moved a hog shed from his home place onto the land, and in the late 1940's he built a 14 by 44 foot house on the land, which he finished on the inside. In the construction of the house he used sheet rock and lumber. In the late 1940's he also dug a well on this land. In 1927, there were no roads on the land, and there are now roads that run up and down the bar to the neck and to each field on the land with a well-worn track. In 1927, he did not ask anybody about going onto this land, he just went on it and took it over. There were no buildings on it, no fields were cleared off, and no one was pasturing the land or using it as their own. The only

times the plaintiff was on this land that he could remember was when the plaintiff and his first wife came there one time, and the second time when the plaintiff and his second wife came to his place to ask him to sign a lease, which he refused to sign. The plaintiff demanded that the defendant pay him $10 or $15, which the defendant refused to do. He saw the plaintiff a couple of days later. He had a trespass sign which he put along the side of the road where the defendant would go into the upper end of the island. The plaintiff said he wanted the defendant to stay out. The defendant further testified that he never saw the plaintiff clear any of the land in question nor build any fences or buildings on it. He denied having a lease with the plaintiff or any other person, and claimed to be the owner of the land and had occupied it since 1927.

John Schmidt testified that he started farming on St. Helena Island in 1930. He rented the land from Joe Jones and Mrs. Jones, and had a rental agreement in 1932, 1933, and 1934. In 1933, the chute gradually filled up between the islands. The land he rented was not the land now in controversy, and he did not farm such land. He also rented land from other parties. He farmed the land on St. Helena Island proper from 1930 to 1945. The plaintiff did not make a lease of any kind with him for the land in controversy, and from 1930 to 1945, he did not pay the plaintiff any rent for such land. The defendant was farming this land at that time, and at the same time this witness was farming land down on St. Helena Island. The defendant started farming this land in 1934, built fences on it, and used the pasture thereon from 1927. He traveled over this land after 1934 to get to St. Helena Island, with the defendant's permission. He never saw the plaintiff on the land in controversy except one time when he went up with a tractor to have this witness help to take the tractor across the chute. He never asked the plaintiff to have the defendant take over a lease.

A nephew of the defendant testified that he and John Schmidt were on the land in controversy in 1931, and helped to construct the boundary line fence that separated the land of his father, George Schmidt, from the land occupied by the defendant. In 1938, he was on the land in controversy and observed the defendant working the land. Small patches of the land had been cleared in 1934. He never saw the plaintiff on this land from 1931 to 1938, nor did he see John Schmidt farming this land during any of that time.

Another witness testified that the first time he was on this land in controversy was in 1930, at which time his father had traded saddle horses with the defendant. He observed that there were cattle on the land at that time. He was on the land several different times from 1930 to 1936, and observed the defendant clearing the land, but did not observe the plaintiff farming it.

The defendant's wife corroborated the testimony of the defendant with reference to the presentation of the lease by the plaintiff to the defendant for the purpose of having it signed, which the defendant refused to do. She testified that her husband ran cattle on this land in 1927, and she helped to drive the cattle onto the land; that the land has always been farmed as their own land; that they never paid rent to anybody, but continued to claim it as their own land; and that they were not bothered until 1953, when the plaintiff presented the lease. She helped to clear the land and plant crops of corn, alfalfa, oats, sweet clover, and popcorn. She further testified that the plaintiff had never farmed any land north or to the west of the neck, and neither had John Schmidt; and that she and her husband cleared all of the land north and west of the neck and claimed ownership of it.

In addition to the before-cited authorities, the following is also applicable in the instant case.

Any evidence tending to show which party is entitled to possession, whether it be title deeds or other written or oral testimony, should be considered. But a justice

of the peace, and also a county judge, can try only the right of possession. If that right depends upon some right of defendant, whether legal or equitable, in the property itself, he must dismiss the action for want of jurisdiction. See Stone v. Blanchard, 87 Neb. 1, 126 N. W. 766.

There is competent evidence tending to show that there is in fact a title to real estate in question tendering a genuine issue which the parties are entitled to have adjudicated.

For the reasons herein given, the judgment entered on the verdict should be, and is hereby, reversed, and the cause remanded with directions to dismiss the action.

REVERSED AND REMANDED WITH DIRECTIONS.